AMERICAN RE–INSURANCE COMPANY, Plaintiff,

v.

The INSURANCE COMMISSION OF the STATE OF CALIFORNIA, as liquidator of Signal Insurance Company and of Imperial Insurance Company, the Chief of the Receivership Division of the Department of Insurance of the State of Alabama, as ancillary liquidator of Imperial Insurance Company, the Department of Insurance of the State of Florida, as ancillary receiver of Signal Insurance Company and of Imperial Insurance Company, the California Insurance Guarantee Association, the Arizona Property and Casualty Insurance Guaranty Fund Board, the Iowa Insurance Guarantee Association, the Nevada Insurance Guarantee Association, the Florida Insurance Guarantee Association, the Washington Insurance Guarantee Association, the Alaska Insurance Guarantee Association, the Kansas Insurance Guarantee Association, the Oregon Insurance Guarantee Association, the Utah Insurance Guarantee Association and Dr. Robert Watanabe, Defendants.

State of Nevada and Rauel Sawyer, Intervenors.

No. CV 78–4069–WMB.

United States District Court, C. D. California.

Aug. 7, 1981.

Martha Bannerman, Adams, Duque & Hazeltine, Los Angeles, Cal., for plaintiff.

Peter M. Appleton, Tyre & Kamins, Paul S. Leevan, Klinger & Leevan, Ned Good, Law Offices of Ned Good and Samuel Shore, Jonathan F. Bank, Buchalter, Nemer, Fields, Chrystie & Younger, Caldwell & Toms, Kenneth H. Clausen, Clausen, Harris & Campbell, Eric Nelson Lindquist, Los Angeles, Cal., Robert Ong Hing, Stockton & Hing, Phoenix, Ariz., Edmond Mamer, Deputy Atty. Gen., Edward J. Horowitz, Los Angeles, Cal., Wayne Wilson, Carson City, Nev., for defendants.

WM. MATTHEW BYRNE, Jr., District Judge.

This action arises out of the insolvency of the Signal Insurance Company ("Signal"), and the Imperial Insurance Company ("Imperial"), (collectively, "Signal/Imperial"). Plaintiff American Re-Insurance Company ("American") entered into reinsurance and retrocession agreements with Signal/Imperial, which obligate American to indemnify Signal/Imperial for a certain portion of losses on insurance policies written by these companies. Following the insolvency of Signal/Imperial, various parties have made conflicting demands for direct payment of proceeds due under the reinsurance contracts executed by American and Signal/Imperial.

The Second Amended Complaint names as defendants: the Insurance Commissioner of the State of California, as domiciliary liquidator of Signal/Imperial ("California Commissioner");[1] the Chief of the Receivership Division of the Department of Insurance of the State of Alabama, as ancillary liquidator of Imperial;[2] the Department of Insurance of the State of Florida, as ancilary receiver of Signal/Imperial ("Florida Department");[3] the California Insurance Guarantee Association ("CIGA"); the Arizona Property and Casualty Insurance Guaranty Fund Board ("AIGFB"); the Iowa Insurance Guaranty Association; the Nevada Insurance Guaranty Association ("NIGA"); the Florida Insurance Guaranty Association ("FIGA"); the Washington Insurance Guaranty Association; the New Jersey Property-Liability Insurance Guaranty Association; the Alaska Insurance Guaranty Association; the Kansas Insurance Guaranty Association; the Oregon Insurance Guaranty Association; the Utah Insurance Guaranty Association;[4] Dr. Rob-

---

1. On January 10, 1978, in an action in the Superior Court of the State of California for the County of Los Angeles, the California Commissioner was appointed liquidator of Signal, after having served since 1975 as conservator of Signal. *Insurance Commissioner of the State of California v. Signal Insurance Company*, No. C 136919 (Jan. 10, 1978). On the same day, the California Commissioner was appointed liquidator of Imperial, after having served since 1975 as conservator of Imperial. *Insurance Commissioner of the State of California v. Imperial Insurance Co.*, No. C 136921 (Jan. 10, 1978).

2. Counsel for American has represented that the Chief of the Receivership Division of the Department of Insurance of the State of Alabama is in default and that default has been entered.

3. On January 11, 1978, in an action in the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida, the Florida Department was appointed Florida Receiver of Signal/Imperial, after having served since 1975

as "Ancillary Receiver for Purposes of Conservation" of Signal/Imperial. *See* Answer of Florida Department to First Amended Complaint, at ¶ 4.

4. On January 23, 1979, by stipulation, this action was dismissed without prejudice as to defendant Kansas Insurance Guaranty Association. On January 30, 1979, by stipulation, this action was dismissed without prejudice as to defendants Alaska Insurance Guaranty Association, Iowa Insurance Guaranty Association, Oregon Insurance Guaranty Association, and Washington Insurance Guaranty Association.

Notwithstanding these orders of dismissal, the Second Amended Complaint names the above-mentioned parties as defendants. Counsel for American has represented that the inclusion of these parties as named defendants in the Second Amended Complaint was inadvertent.

In addition, counsel for American has represented that defendant New Jersey Property-Liability Insurance Guaranty Association has not been served, and that a dismissal as to that

ert Watanabe; and J. Michael Low, Director of Insurance for the State of Arizona, as ancillary receiver of Imperial.[5]

The Second Amended Complaint alleges five claims for relief. The First Claim seeks a declaratory judgment as to American's right to an offset against any reinsurance proceeds that it may owe pursuant to its reinsurance agreements with Signal/Imperial. The Second Claim seeks a declaratory judgment that American must pay any reinsurance proceeds due Signal/Imperial to the California Commissioner and not to other defendant/claimants. The Third Claim is for a declaratory judgment that American is not liable to Watanabe, an original insured of Signal/Imperial, or to Rauel Sawyer, a third-party claimant against Signal/Imperial, for any obligation arising out of a malpractice claim brought against Watanabe by Sawyer and allegedly covered by his policy with Signal/Imperial.[6] The Fourth Claim is one for statutory interpleader, pursuant to 28 U.S.C. § 1335, concerning a liquidated Florida claim against Signal/Imperial under which American's maximum reinsurance liability is $63,000. American has deposited $63,000 with the Court and named the Florida Department, the California Commissioner, and FIGA, as adverse claimants to the fund.[7] American also claims a portion of the fund by way of

---

defendant would be filed. However, counsel has failed to file such a dismissal. Finally, counsel represented that this action had been dismissed as to defendant Utah Insurance Guaranty Association. However, no order of dismissal is on record.

Therefore, based on the representations of counsel for American, this Court, by separate order issued July 14, 1981, dismissed, without prejudice, the Second Amended Complaint as to the above-mentioned parties.

5. On March 24, 1980, in an action in the Superior Court of Maricopa County, Arizona, J. Michael Low, Director of Insurance for the State of Arizona, was appointed ancillary receiver of Imperial. *State of Arizona, ex rel. J. Michael Low, Director of Insurance v. Imperial Insurance Co.*, Cause No. C–403617 (March 24, 1980).

6. Dr. Watanabe had a medical malpractice insurance policy with Signal/Imperial that was partially reinsured by American. Watanabe was a defendant in a medical malpractice action brought by Rauel Sawyer. Watanabe and Sawyer entered into a settlement for $2,650,-000.00. Only $499,000.00 of the settlement has been paid to Sawyer. Watanabe claims that American is liable for direct payment to Sawyer of a portion of the remaining balance due pursuant to the settlement.

In his Answer to the Second Amended Complaint, Watanabe, for the first time, alleged two counterclaims against American. The first counterclaim alleges a violation of Cal.Ins. Code § 790.03(h)(5), which requires insurance companies in California to attempt "in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." The second counterclaim alleges that American's failure to meet its obligations to Watanabe, by its reliance on certain California statutes, constituted a deprivation of his rights under the United States Constitution and unspecified federal statutes.

American has moved either to dismiss the counterclaims, on the ground that they were not timely filed, or, in the alternative, for summary judgment as to the counterclaims. These motions are still pending before this Court.

On June 17, 1981, the parties stipulated that all counterclaims of defendant-counterclaimant Watanabe were dismissed with prejudice. In addition, the parties agreed to waive the necessity of a motion to intervene, and to allow the intervention of Rauel Sawyer, as of May 4, 1981, as an additional named defendant in the third claim for relief, and as counterclaimant in the claims for relief previously asserted by Watanabe against American. All pleadings and memoranda of Watanabe were designated to be pleadings and memoranda of Sawyer, and all pleadings and memoranda of American directed against Watanabe were designated to be in response to pleadings of Sawyer, except that American expressly reserved the right to assert any new defenses or additional arguments it has against Sawyer, including, but not limited to, defenses based on the passage of time. This stipulation was filed on July 13, 1981.

7. In a suit in the Circuit Court for the Seventeenth Judicial Circuit, in and for Broward County, Florida, Terry Schessler sued Harry Jones, M.D., Harry Jones, M.D., P.A., and FIGA, based on alleged medical malpractice by Jones. At the time of the alleged malpractice, Signal was Jones' malpractice insurance carrier. FIGA effectuated a settlement whereby Jones became obligated to pay $280,000.00. Of this obligation, $100,000.00 was retained by FIGA. A portion of the remaining obligation is covered by the Signal insurance policy and partially reinsured by American. FIGA, the Florida Department, and the California Commissioner all claim a right to receive direct payment of the reinsurance proceeds related to the Jones' settlement.

On June 28, 1979, this Court issued an Order enjoining the Florida Department and FIGA

an alleged right to offset.[8] The Fifth Claim seeks a declaratory judgment that American must pay to the California Commissioner, and not Low,[9] any reinsurance proceeds it may owe to Signal/Imperial.

The California Commissioner moves for partial summary judgment, pursuant to Fed.R.Civ.P. 56, on the ground that there is no genuine issue of material fact as to whether it is entitled to receive any reinsurance proceeds that are or may become due from American under its reinsurance agreements with Signal/Imperial, and that it is entitled to partial summary judgment, as a matter of law, in its favor, as to the Second, Third, Fourth, and Fifth Claims for Relief, except to the extent that such claims involve issues of American's asserted right to an offset, or claims of bad faith. American moves for partial summary judgment on the same ground.[10] In addition, the Reinsurance Association of America has filed an amicus brief in support of the California Commissioner's motion for partial summary judgment.

## I

■ Summary judgment may properly be granted only when no genuine issue of any material fact exists or, when viewing the evidence and the inferences that may be drawn therefrom in the light most favorable to the adverse parties, the movants are clearly entitled to prevail as a matter of law. *See Gaines v. Haughton,* 645 F.2d 761, 769 (9th Cir. 1981); *Smith v. Gross,* 604 F.2d 639, 641 (9th Cir. 1979); *Real v. Discoll Strawberry Associates, Inc.* 603 F.2d 748, 753 (9th Cir. 1979); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1254 (9th Cir. 1976) (per curiam).

The reinsurance agreements entered into by American and Signal/Imperial each contain a clause regarding payment of reinsurance proceeds in the event of the insolvency of Signal/Imperial. With immaterial variations, the insolvency clause in each agreement provides, in part:

> The *reinsurance* provided by this Agreement . . . *shall be payable* by the Reinsurer *directly to* [Signal/Imperial] or to *its liquidator, receiver or statutory successor* on the basis of the liability of [Signal/Imperial] under the contract or contracts reinsured without diminution because of the insolvency of [Signal/Imperial].

> The reinsurance shall be payable as hereinbefore . . . provided except as otherwise provided by Section 315 . . . . of the Insurance Law of New York or except (a) where the contract specifically provides another payee of such insurance in the event of the insolvency of [Signal/Impe-

---

from bringing, maintaining, or prosecuting any suit, action, or proceedings, other than this action, against American on account of any reinsurance proceeds purportedly due from American to such defendants, based on or derived from any insurance coverage provided to Florida residents by Signal/Imperial.

8. After the First Amended Complaint was filed, *defendants Florida Department, FIGA, NIGA, and AIGFB* moved, on various grounds, for dismissal of this action as to the claims alleged against them. On July 14, 1981, this Court issued an Order denying the motions to dismiss or quash service of process brought by defendants Florida Department, FIGA, and AIGFB; granting defendant NIGA's motion for lack of personal jurisdiction; and dismissing the action without prejudice as to NIGA.

On March 3, 1980, this Court granted the State of Nevada's unopposed motion to intervene.

9. The First Amended Complaint alleged the first four claims for relief discussed *supra.* The Second Amended Complaint is identical to the First Amended Complaint, except that it adds as a defendant, J. Michael Low, Director of the Arizona Insurance Department, as Ancillary Receiver of Imperial, and alleges an additional (the Fifth) Claim for Relief.

Low moved for dismissal of the Fifth Claim on the ground that subject matter jurisdiction is lacking. Alternatively, Low moved for dismissal on the grounds that this action involves Arizona state interests. On July 14, 1981, this Court issued an Order denying Low's motion to dismiss. In addition, the Order enjoined Low from making any claim to the subject reinsurance proceeds without the prior consent of this Court, pending resolution of this action.

10. American has adopted the Memorandum of Points and Authorities, the Findings of Fact and Conclusions of Law, and other pleadings submitted by the California Commissioner in support of its motion.

rial] and (b) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of [Signal/Imperial] as direct obligations of the Reinsurer to the payees under such policies and in substitution for the obligations of [Signal/Imperial] to such payees. [emphasis supplied].

See, e.g., Endorsement No. 2 to Article XVIII, Agreement No. 3546–0030; Exhibit E to Semple Affidavit, at 146–47.

The parties do not contend that § 315 of the New York Insurance Law applies in this case.[11] Nor does any party contend either that American has expressly assumed the policy obligations of Signal/Imperial or that the reinsurance agreements specifically provide for payees, other than the "liquidator, receiver or statutory successor," in the event of insolvency. Therefore, the issue raised by the present motions for partial summary judgment is: Who is the "liquidator, receiver, or statutory successor," within the meaning of the subject agreements, entitled to receive direct payments from American of the reinsurance proceeds? The resolution of this issue will depend on the applicable law governing the interpretation of the reinsurance agreements and the insolvency of insurers.

## II

■ Under the Constitution, the federal government has the power to regulate insurance as part of interstate commerce. See United States v. South-Eastern Underwriters, Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). It has, however, expressly declined to exercise that power and has left such regulation to the states. See McCarran-Ferguson Insurance Regulation Act, 15 U.S.C. §§ 1011 to 1015 (1976). Similarly, although the Constitution would support federal regulation of insurer-insolvency proceedings, see U.S. Constitution art. 1, § 8, cl. 4, Congress has declined to exercise its power to do so. See Bankruptcy Act, 11 U.S.C. § 22(b) (1976) (current version at 11 U.S.C.A. § 109 (West 1979)). Thus, appropriate State laws regulate insurer insolvency, and, in particular, govern the direct payment of reinsurance proceeds in the event of insurer insolvency.

■ Jurisdiction in this case is based on diversity of citizenship, 28 U.S.C. § 1332(a) (1976). Therefore, this Court must apply the law of the forum state, including its choice of law principles, to resolve the present controversy. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This principle also applies to actions brought under the federal Interpleader Act, 28 U.S.C. § 1335.

■ In the absence of choice of law by the parties,[12] Cal.Civ.Code § 1646 requires

11. The insolvency clauses in the subject reinsurance agreements state that "[t]he reinsurance shall be payable" as set forth therein, "except as otherwise provided by Section 315 of the Insurance Law of New York." (See, e.g., Article XVIII, Agreement No. 3546–0030; Exhibit E to Semple Affidavit, pp. 146–47). Section 315 permits a fidelity or surety company to exceed the limits on exposure to risk, set forth in § 47 of the New York Insurance Law, by carrying reinsurance that allows for a direct action by the insured against the reinsurer. None of the parties contend that Section 315 applies in the present case.

12. If the parties have selected a state's law to control, California courts will apply that law, as long as there is a reasonable basis for that choice and the law chosen does not contravene a strong public policy of California. See Foreman v. George Foreman Associates, Ltd., 517 F.2d 354, 356 (9th Cir. 1975); Developers Small Business Investment Corp. v. Hoeckle, 395 F.2d 80, 83 (9th Cir. 1968); Gamer v. duPont Walston, Inc., 65 Cal.App.3d 280, 287–88, 135 Cal. Rptr. 230, 233–34 (1976); Restatement (Second) of Conflicts of Laws § 187, at 561 (1971). None of the reinsurance agreements entered into by American and Signal/Imperial contain choice of law provisions.

There are, however, several references to New York law in the reinsurance agreements. See, e.g., Exhibit E to Semple Affidavit. For example, the agreements provide that, in the event of insolvency, offsets shall be allowed in accordance with the provision of Section 538 of the Insurance Law of New York. Moreover, the insolvency clause of the agreements is substantially identical to the language contained in New York Insurance Law § 77. The parties did not, however, specifically choose the law of any particular state to govern the entire agreement. Consequently, the Court cannot conclude that the parties chose a particular law to

application of the law of the place of performance, if specified, or, if the agreement does not indicate a place of performance, the law of the place where the contract was made. *See Henderson v. Superior Court*, 77 Cal.App.3d 583, 592–93, 142 Cal.Rptr. 478, 483–84 (1978). The place of performance of the contract is determined according to the intent of the parties, either as expressed or as ascertained by an examination of the circumstances surrounding the agreement. *See Hale v. Bohannon*, 38 Cal.2d 458, 241 P.2d 4 (1952).

In the present case, although payment of reinsurance premiums may have been made in New York, the principal place of business of American, the payment of reinsurance proceeds, in the absence of insolvency, was to be made directly to Signal/Imperial in California. In the event of insolvency, the agreements provide for the direct payment of reinsurance proceeds to the "liquidator, receiver or statutory successor." Arguably, the parties contemplated that such payment would also occur in California, the state of the domiciliary liquidator. Thus, under § 1646, California law would apply to determine who is the "liquidator, receiver or statutory successor."[13]

■ When application of § 1646 is unclear, California courts have considered the factors set forth in the *Restatement, supra*, § 188, at 575, which provides that, in the absence of choice by the parties to the agreement, the relationship of the parties is governed by the law of the state having the most significant relationship to the transaction. *See Henderson*, 77 Cal.App.3d at 592–93, 142 Cal.Rptr. at 483–84. The factors to be considered include the place of contracting, the place of negotiation, the place of performance, the location of the subject matter of the contract, and the domicile, residence, and place of business of the parties. *Restatement, supra*, § 188(2), at 575.

■ Since the enactment of § 1646, California has moved away from application of mechanical choice of law principles, and has, instead, applied the "governmental interest analysis" approach, even in contract cases. *See Strassberg v. New England Mutual Life Insurance Co.*, 575 F.2d 1262, 1263–64 (9th Cir. 1978); *Diamond Mining and Management, Inc. v. Globex Minerals, Inc.*, 421 F.Supp. 70, 73–74 (N.D.Cal.1976); *Bernkrant v. Fowler*, 55 Cal.2d 588, 360 P.2d 906, 12 Cal.Rptr. 266 (1961); *Dixon Mobile Homes, Inc. v. Walters*, 48 Cal.App.3d 964, 972, 122 Cal.Rptr. 202, 207–08 (1975). Under this approach, the Court must first assess the interests of the states having a relationship to the agreements or transactions; determine whether there is a conflict of interests between the law of those states and the law of California; and, in the event that there is a conflict, examine the comparative impairment to each state's interest by the choice of one rule over another. *See Strassberg*, 575 F.2d 1262.

■ Numerous states can claim a relationship to the agreements in the present case: California, as the state of Signal/Imperial's domiciliary liquidator, and place of partial performance of the agreements; New York, as American's principal place of business, and the place of partial performance; Florida, Alabama, and Arizona, as states that have appointed ancillary liquidators or receivers for Signal and/or Imperial; California, Arizona, and Florida, as states that have insurance guaranty associations that have made claims for the direct payment of the subject reinsurance proceeds and are parties to this action; and any state where claimants or creditors of Signal/Imperial reside.

apply to the interpretation of the term "liquidator, receiver or statutory successor."

Even assuming that the parties had chosen New York law, the Court concludes that the application of that law would not result in a disposition of the proceeds different than the result that is reached herein. *See infra*, at 455 & n.20.

13. Section 1646 provides that if the agreement does not indicate a place of performance, the law of the place where the contract was made shall govern. *See Henderson v. Superior Court*, 77 Cal.App.3d 583, 592–93, 142 Cal.Rptr. 478, 483–84 (1978). American has submitted an affidavit that states that the agreements for reinsurance were entered into in California.

An examination of the laws of California and the other affected states reveals no apparent conflict of law. However, even assuming that such a conflict were to exist, no state has a more significant relationship to the agreements and transactions in this case than California, or has an interest in applying its laws that is superior to that of California, the state of the domiciliary liquidator. Therefore, under § 1646 or the governmental interests analysis, California law must govern the determination of who is entitled to direct payment of the reinsurance proceeds in this case.

### III

Under California law, insurance companies must meet certain financial standards in order to do business. Cal.Ins.Code § 699 et seq. (West 1972). The insurer must maintain specified minimum reserve requirements based on the amount and type of insurance in force and the insurer's loss exposure. Cal.Ins.Code § 11558. The reserve requirements establish the assets that an insurer must have available to pay all claims, losses, and adjustment and settlement expenses. These requirements have the express purpose of "adequately protecting the insured and securing the solvency of the insurer." Cal.Ins.Code § 923.5.

"A contract of reinsurance is one by which an insurer procures a third person to insure him against loss or liability by reason of such original insurance." Cal.Ins.Code § 620.[14] A fundamental purpose of reinsurance is to permit an insurer to reduce its reserve requirement. California requires insurers to file financial statements with the state. Cal.Ins.Code § 900 et seq. On those statements, an insurer may deduct certain risks from its liabilities, provided those risks are subject to reinsurance. Cal. Ins.Code §§ 922.1 & 922.15. By utilizing reinsurance, therefore, an insurer can spread the risk it undertakes over a larger number of policies, effectively reduce the amount of reserves required to maintain its business, and increase its profitability. *See Skandia America Reinsurance Corp. v. Schenck*, 441 F.Supp. 715, 724 (S.D.N.Y. 1977), *citing* Olson, *Reinsurer's Liability to the Insolvent Reinsured*, 41 Notre Dame Law. 13, 15–16 (1965). The deductions under §§ 922.1 & 922.15 allow an insurer to treat reinsurance much like an asset on its financial statements.

Cal.Ins.Code § 922.2 mandates the inclusion of insolvency clauses in reinsurance agreements before the amount of risk reinsured is permitted to reduce an insurer's reserve requirement:

No such deductions specified in Sections 922.1 and 922.15 shall be made or allowed unless the contract of reinsurance contains provision in substance as follows:

. . . .

In the event of insolvency and the appointment of a conservator, liquidator or statutory successor of the ceding company, such portion shall be payable to such conservator, liquidator or statutory successor immediately upon demand, . . . except where the contract of insurance or reinsurance specifically provides another payee of such reinsurance in the event of insolvency of the ceding insurer.

Section 922.2 ensures that reinsurance proceeds will be preserved for the benefit of all insureds, claimants, and creditors of an insolvent insurer by providing that if the insurer wishes to treat reinsurance as an asset for purposes of reducing its reserve requirement, the reinsurance proceeds must be payable to the insurer, or its "conservator, liquidator or statutory successor," in the event of the insurer's insolvency. *Cf. Skandia*, 441 F.Supp. at 725 (interpreting similar New York statutory provisions). Reinsurance loses most of its value if it cannot be utilized by the insurer as a deduction from liability. Olson, *supra*, at 22. Section 922.2 thus functions to increase the

---

14. Reinsurance has been defined as:

a contract whereby one insurer for a consideration contracts with another to indemnify it against loss or liability by reason of a risk which the latter has assumed under a separate and distinct contract as the insurer of a third person.

13A J. Appleman & J. Appleman, *Insurance Law and Practice* § 7693, at 523 (rev. ed. 1976).

size of the pool of assets in which all of the defunct insurer's creditors may share.

▮ Thus, reinsurance agreements are separate and distinct from the policy agreements entered into by the insurer and its insureds, for which, in the event of liability, the reinsurance would provide indemnification. *See Connecticut General Life Ins. Co. v. Johnson*, 3 Cal.2d 83, 43 P.2d 278, *appeal dismissed* 296 U.S. 535, 56 S.Ct. 103, 80 L.Ed. 380 (1935). Cal.Ins.Code § 623 states that "[t]he original insured has no interest in a contract of reinsurance." The Code further provides that "[t]he original insured or policyholder shall not have any rights against the reinsurer which are not specifically set forth in the contract of reinsurance, or in a specific agreement between the reinsurer and the original insured or policyholder." Cal.Ins.Code § 922.2.

Section 922.2 specifically provides that payment of reinsurance proceeds is to be made directly to the insurer, or to its conservator, liquidator, or statutory successor, in the event of insolvency, unless the reinsurance agreement expressly provides otherwise.[15] The insolvency clause contained in the reinsurance agreements between American and Signal/Imperial provides for direct payment to the original insured only where the insurance contract specifically provides for such payment and the reinsurer has assumed the insurer's obligation to the original insured by executing a novation.[16]

▮ Under California law, the California Commissioner is the designated liquidator of a domestic insurance company, and has been conferred with broad powers to administer the affairs of the insolvent insurers for the benefit of creditors, policyholders, and the public. Cal.Ins.Code §§ 1011, 1037 & 1057;[17] *Kinder v. Superior Court*, 78 Cal.App.3d 574, 578, 144 Cal.Rptr. 291, 294 (1978); *Rhode Island Ins. Co. v. Downey*, 95 Cal.App.2d 220, 212 P.2d 965, 974–75 (1949). The California Commissioner, pursuant to this statutory scheme, is, therefore, the "statutory successor" of Signal/Imperial within the meaning of § 922.2 and the reinsurance agreements.

### A.

▮ Intervenor Sawyer asserts a right to receive direct payment of reinsurance proceeds on the ground that he is a third-party claimant with respect to a medical malpractice insurance policy issued by Signal/Imperial to Dr. Watanabe and partially reinsured by American.[18] A third-party claimant, however, has no greater right to receive direct payment of reinsurance proceeds than that of the original insured, on whose policy the third-party claimant seeks to recover. Sawyer does not contend that there is any separate agree-

---

**15.** Thus, the California statutory scheme codifies the general principle of insurance law that reinsurance proceeds are not payable directly to the original insured. *See* 13A J. Appleman & J. Appleman, *supra* note 14, at § 7681; *Skandia America Reinsurance Corp. v. Schenck*, 441 F.Supp. 715, 724 (S.D.N.Y.1977) (New York law).

**16.** A novation effectively converts the reinsurance, which is a contract for indemnification of the ceding insurer, to a policy of coinsurance. *See Skandia*, 441 F.Supp. at 724. The original insured and a reinsurer thereby create privity between themselves so that the reinsurer becomes a primary insurer. Such a novation

> is not one of technical reinsurance, for here the so-called "reinsurance" is but substituted for the original insurer, and hence becomes the immediate insurer of the subject of the original policy, instead of being the insurer of

the original insurer's risk by reason of such policy, as would be the case if the transaction were one of proper reinsurance. In such cases of novation the original insurer is, of course, wholly discharged from any obligation that may have existed under the former policy, and the insured in turn secures the same rights against the so-called "reinsurer" as if the policy had been originally issued by him.

W. Vance, *Handbook on the Laws of Insurance* § 207, at 1073–74.

**17.** For example, Cal.Ins.Code § 1057 provides:
> In all proceedings under this article, the commissioner shall be deemed to be a trustee for the benefit of all creditors and other persons interested in the estate of the person against whom the proceedings are pending.

**18.** *See* note 6 *supra*.

ment between American and Watanabe, much less a novation of the policy agreement between Watanabe and Signal/Imperial. Nor does Sawyer contend that there are specific provisions set forth in the reinsurance agreements between American and Signal/Imperial that would entitle Watanabe to receive direct payment of reinsurance proceeds. Therefore, under California law and the reinsurance agreements, neither Watanabe nor Sawyer has any right to the direct payment of the reinsurance proceeds.

### B.

Defendant Florida Department, however, argues that § 922.2 does not contemplate a single "statutory successor." The Department contends that, as ancillary receiver of Signal/Imperial for the state of Florida, it should receive direct payment of reinsurance proceeds generated by the claims or settlements of Signal/Imperial insureds who reside in Florida. The Department argues that such reinsurance proceeds, especially those related to liquidated claims (such as the claim involved in the interpleader in this case), are Florida assets. Defendant Low, as the Arizona ancillary receiver for Imperial, makes substantially the same argument with respect to reinsurance proceeds generated by the claims or settlements of Imperial insureds who reside in Arizona.

 It is well established that every state has jurisdiction to determine for itself the administration of a foreign insurer's property situated within its territorial limits, and may, by statute, authorize the liquidation of such local assets of an insolvent foreign insurer for the benefit of local creditors. See *Clark v. Williard*, 294 U.S. 211, 55 S.Ct. 356, 79 L.Ed. 865 (1935). An ancillary receiver's function is to collect assets within its state and apply them for local creditors' claims in accordance with the law

of that state. His jurisdiction does not transcend the borders of his state, as opposed to the domiciliary liquidator, whose title to all the insurers' assets, wherever situated, must be recognized by every state. *Id.*, 294 U.S. at 214–15, 55 S.Ct. at 357–58.

 The reinsurance proceeds, under the express terms of the subject reinsurance agreements and under general insurance law, are not directly payable to Signal/Imperial's insureds and, therefore, they are not directly payable to an entity standing in the stead of those insureds. The right to recover reinsurance proceeds is a chose in action owned solely by a ceding company such as Signal/Imperial. Reinsurance proceeds are not local assets over which ancillary receivers can exercise control. Section 922.2 contemplates only one "conservator, liquidator or statutory successor" for purposes of receiving direct payment of reinsurance proceeds, which have affected the financial statement and reserves of the insurer, and which are general assets for creditors of the insolvent insurer.[19] Under California law, the domiciliary liquidator is intended to be the sole statutory successor of the insolvent insurer for purposes of receiving direct payment of reinsurance proceeds. *Cf. Thatcher v. City Terrace Cultural Center*, 181 Cal.App.2d 433, 5 Cal.Rptr. 396, 403–04 (1960) (domiciliary liquidator of New York was vested with title to all assets of defunct insurer). This intent appears to be consistent with the statutory schemes of other states. *See, e.g., Skandia*, 441 F.Supp. at 724–25 (under New York and New Jersey law Superintendent is statutory successor); *General Reinsurance Corp. v. Missouri General Insurance Co.*, 458 F.Supp. 1, 5 (W.D.Mo.1977), *aff'd*, 596 F.2d 330 (8th Cir. 1979) (Mississippi law); *State of Florida ex. rel. O'Malley v. Department of Insurance*, 155 Ind.App. 168, 291 N.E.2d 907 (1973) (under Indiana law,

---

**19.** Section 922.2 provides for payment by the reinsurer to "*a* conservator, liquidator or statutory successor." [emphasis supplied]. In contrast, § 922.2 refers to liability based on claims allowed "by *any* conservator, liquidator or statutory successor of the company having authori-

ty to allow such claims." [emphasis supplied]. The language of § 922.2 suggests that the legislature intended there to be a single statutory successor for purposes of receiving the direct payment of reinsurance proceeds, based on claims allowed by various statutory successors.

Indiana domiciliary receiver, and not Florida ancillary receiver, is entitled to direct payment of reinsurance proceeds).[20]

### C.

CIGA argues that, even assuming that the California Insurance Commissioner was the intended sole statutory successor of insolvent insurers prior to 1969, the enactment of Cal.Ins.Code § 1063 *et seq.*, in that year, altered the statutory scheme.

Sections 1063 *et seq.* established CIGA to protect certain California residents from losses from the insolvency of insurers writing business in California.[21] This protection is accomplished by requiring that all insurers writing certain lines of insurance become members of CIGA. Cal.Ins.Code § 1063(a). Upon the insolvency of any member, CIGA collects funds from other member insurers, premium payments, to pay California claimants of the insolvent insurer. Cal.Ins.Code §§ 1063.1(c)(1) & 1063.5. The only claims covered by this scheme are those that arise out of policy obligations of the insolvent insurer. Cal. Ins.Code § 1063.1(c)(1). As to those obligations, CIGA is required to defend, participate in the settlement of, and pay, claims up to certain amounts, as if it were the insolvent insurer. Cal.Ins.Code § 1063.2.

> Cal.Ins.Code § 1063.2(d) provides, in part: [CIGA] *shall receive the benefit* of any amounts recoverable on reinsurance contracts or treaties entered into by the insolvent insurer which cover any of the liabilities incurred by the insolvent insurer of the category or categories involved provided such benefits shall be limited to payments upon or loss adjustment expenses or defense costs actually paid out by the association .... The commissioner, as liquidator, shall receive the benefit of any such reinsurance recoverable to the extent of payments on claims, loss adjustment expenses or defense costs made prior to the order of liquidation. [emphasis supplied].

CIGA argues that the enactment of § 1063.-2(d) was intended to make it a "statutory successor" to insolvent insurers, within the meaning of § 922.2, and, therefore, entitles it to the direct payment of reinsurance proceeds. As further support for its position, CIGA cites Cal.Ins.Code § 1063.2(b), which provides, in part:

> [t]he association shall be a party in interest in all proceedings involving a covered claim, and shall have the same rights as the insolvent insurer would have had if not in liquidation ....

This provision, CIGA contends, allows CIGA to step into the stead of the insolvent insurer and, therefore, to make any direct claim that the insurer could have made, but for the insolvency, to reinsurance proceeds related to claims paid by CIGA.

The language "shall receive the benefit of any amount recoverable," in § 1063.2(d) *must be construed in light of other provisions* that govern the liquidation of insurers. Such related Insurance Code provisions refer to the California Commissioner as the liquidator of the insolvent insurers. Cal.Ins.Code § 1037. Sections 1021, 1023, and 1033 provide for the filing of claims with the California Commissioner, on forms prescribed by him and for the payment of claims against insolvent insurance companies. Section 1033 specifically provides for payment of claims to assets, which would

---

**20.** There is no indication that the result would be different if the laws of Florida or Arizona were applied. (According to Low, the Superior Court of Arizona, by minute order, in an action involving the California Commissioner and Low, ruled that the claims of Arizona residents who were insureds of Imperial did not constitute assets of Low, as ancillary receiver of Imperial; Low has appealed that ruling.) Even assuming that there are conflicting interests, the interest of California, as the state of the domiciliary liquidator, is clearly superior to the interests of the states of ancillary liquidators, and, therefore, California law must apply.

**21.** CIGA was created to provide

> the insured public of the State of California with additional protection by which those persons injured now have the assurance that their claims will be paid, notwithstanding the fact that their claims may be against an insolvent company.

Barger, *California Insurance Guarantee Associations*, 45 Cal.St.Bar J. 475, 482 (1975).

include reinsurance proceeds. The interpretation proffered by CIGA would contravene the singular reference in § 922.2 to the "appointment of a conservator, liquidator or statutory successor" and the mandate of that section that direct payment of reinsurance proceeds is to be made to that single liquidator, who receives those assets for the benefit of all creditors. Most important, CIGA's interpretation would vitiate the priority scheme for creditors provided by § 1033.[22] CIGA is a fifth-level creditor under § 1033. To allow CIGA to receive direct payment of its claims for reinsurance proceeds would, in effect, give it priority over even the first-level creditors set forth in § 1033.

CIGA argues that it was created solely for the purpose of protecting policyholders of the insolvent insurance company. It contends that it should not take a greater risk than the insolvent insurer, and, therefore, that the reinsurance payments should be made directly to CIGA. However, CIGA was created to do more than merely provide protection for those with claims against the insolvent insurer. CIGA was created to provide insurers with "insolvency insurance." Cal.Ins.Code § 1063(a). Insolvency insurance is defined under the Code to include "insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies." Cal.Ins.Code § 119.5. The duty to provide "insurance" implies that CIGA, and its members, were intended to bear some risk for the failure of the insolvent insurer to discharge its obligations. This intent is further evidenced by the § 1033 priority ranking of CIGA below four other categories of creditors. Thus, to some extent, CIGA was created to spread the risk of insurance company insolvency among all insurance companies doing business in the state. The interpretation proffered by CIGA would remove such risk from CIGA and its members.

This Court concludes that § 1063.2 does not make CIGA a "statutory successor" under § 922.2 or entitle it to direct payment of reinsurance proceeds, although § 1033 does provide that CIGA will receive the benefit of the reinsurance proceeds as a fifth-level preferred claimant in the liquidation.[23] CIGA argues that, unless the words "shall receive the benefit" are read to provide for its direct receipt of payment of the reinsurance proceedings, § 1063.2 would be meaningless because § 1033 already confers the right of payment to CIGA of such claims. Section 1063.2(d), however, is susceptible to other reasonable interpretations that would neither render it a nullity nor contravene the priority and risk provisions of related sections.[24]

### D.

The other remaining guaranty association-defendants contend that if CIGA is entitled to receive direct payment under § 1063.2(d), the Constitution requires that the guaranty associations of other states

---

22. Section 1033 now provides that claims shall be given preference in the following order:
 1. Expense of administration.
 2. Unpaid charges due under the provisions of Section 736.
 3. Taxes due to the State of California.
 4. Claims having preference by the laws of the United States and by laws of this state.
 5. All claims of the California Insurance Guarantee Association and associations or entities performing a similar function in other states, together with claims for refund of unearned premiums and all claims of policyholders of an insolvent insurer that are not covered claims. . . .
 6. All other claims
 Cal.Ins.Code § 1033 (West Supp. 1981).

23. *But see Skandia America Reinsurance Corp. v. Barnes,* 458 F.Supp. 13, 16 (D.Colo.1978). In *Skandia,* CIGA claimed to have a direct claim against the insolvent insurer, which was organized under Colorado law. Although the court assumed that CIGA's interpretation of § 1063.2 was correct, it nonetheless held, based on Colorado law, that the Colorado liquidator was entitled to the reinsurance proceeds.

24. For example, the purpose of § 1063.2(d) may be expressly to delineate the extent to which CIGA is entitled to reinsurance proceeds in a liquidation, as a creditor under § 1033, or the extent to which it is entitled to such proceeds vis-a-vis the Commissioner, who is also referred to in § 1063.2(d).

must be given the same priority.[25] In view of this Court's ruling that § 1063.2 does not confer on CIGA, the only guaranty association expressly mentioned in that section, the right to receive direct payment of reinsurance proceeds, it is clear that the section does not confer such a right on out-of-state guaranty associations.[26] Therefore, defendants FIGA and AIGFB are not entitled to the direct payment of reinsurance proceeds owed by American pursuant to its reinsurance agreements with Signal/Imperial.[27]

Finally, CIGA, FIGA, and AIGFB argue that even if § 1063.2(d) does not authorize the direct payment of reinsurance proceeds to insurance guaranty associations, the Court should apply the equitable doctrines of subrogation and equitable liens, which would allow the associations to step into the stead of the insolvent insurer. Although the guaranty associations may be subrogated to the claims of original insureds against Signal/Imperial because of claims they have paid to such insureds, this would not provide CIGA with an action against American because the insureds themselves have no right to direct action against American under the subject agreements. It would be difficult, as well, to apply the doctrines so as to subrogate the associations to claims that Signal/Imperial might have against American. However, even assuming that the doctrines of subrogation and equitable liens could apply, as asserted, the Court would not apply them in this case, where such application would contravene the express statutory scheme of the state of the domiciliary liquidator.

Thus, under California law, the California Commissioner is entitled to any reinsurance proceeds that American may owe to Signal/Imperial pursuant to the reinsurance agreements.

IV

The various defendants raise "issues of fact," which they contend preclude the granting of partial summary judgment in this case. Many of these proffered "issues of fact" are actually legal issues.[28] Other asserted "issues of fact" relate to American's claim to a right of offset against any reinsurance proceeds it may owe under the subject agreements. The motions for partial summary judgment specifically exclude the issue of offset raised in the First and Fourth Claims for Relief. Therefore, the existence of any such issues of fact does not preclude this Court from ruling on the present motions.

Similarly, some parties raise issues of fact as to the amount of money owed by American pursuant to the subject agreements. The principal issue raised by the present motions, however, is whether the California Commissioner is entitled to any and all reinsurance proceeds that American may owe

**25.** The guaranty association-defendants argue that the Equal Protection and Due Process Clauses of the United States Constitution mandate that out-of-state guaranty associations be afforded the same priority as CIGA under California law. Defendants Florida Department, Low, and Intervenor State of Nevada join in this argument.

**26.** Having reached this conclusion, the Court need not address the constitutional issues raised by defendants as to the priority of claimants under California law.

**27.** This result appears consistent with the laws of other states. *See, e. g., Skandia America Reinsurance Corp. v. Schenck*, 441 F.Supp. 715 (under both New York and New Jersey law guaranty association not statutory successor and not entitled to direct receipt of reinsurance proceeds). Even assuming that applying Florida or Arizona law would lead to a different result, the interest of California, as the state of

the domiciliary liquidator, is superior to that of states that have authorized insurance guaranty associations, and, therefore, California law must apply. *Cf. Skandia America Reinsurance Corp. v. Barnes*, 458 F.Supp. 13, 16 (D.Colo. 1978) (applying Colorado law to resolve conflict in favor of Colorado receiver over out-of-state guaranty association); note 20 *supra* (California interest superior to that of other states with ancillary receivers).

**28.** For example, CIGA and FIGA raise the issues of whether Cal.Ins.Code 1063.2(d) gives CIGA the right to receive direct payment of reinsurance proceeds and whether the Court should also consider the doctrines of subrogation and equitable liens in determining whether the guaranty associations are entitled to receive direct payment of the reinsurance proceeds.

under the agreements. Therefore, this Court need not decide the actual amount owed in order to rule.

■ Finally, several defendants raise questions as to the manner in which the California Commissioner, as domiciliary liquidator, will distribute the reinsurance proceeds, in the event that he receives direct payment of all the proceeds.[29] All reinsurance proceeds received by the California Commissioner will be subject to the liquidation proceedings in state court. Any challenge to the priority of preference should not be decided here but, rather, in the liquidation proceedings.

## V

Fed.R.Civ.P. 56(a) provides that "a party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may . . . move for summary judgment in his favor." American properly moves for partial summary judgment as to the claims it has alleged against defendants. Inasmuch as there are no genuine issues of material fact and the California Commissioner is entitled to the reinsurance proceeds as a matter of law, partial summary judgment in favor of American as to those claims is appropriate.

■ The California Commissioner has not alleged a claim or counterclaim in this action. However, Rule 56(b) provides that a party against whom a claim is asserted may move for summary judgment. Because the Second, Third, and Fifth Claims were not asserted against the California Commissioner, he cannot maintain a motion for partial summary judgment as to such claims. Therefore, the California Commissioner's motion for partial summary judgment as to these claims must be denied.

The California Commissioner may properly move for summary judgment under Rule 56(b) as to American's Fourth Claim for Relief, in the nature of a statutory interpleader, pursuant to 28 U.S.C. § 1335. American alleges disinterest as to which interpleader-defendant is entitled to the interpleader fund. Thus, a claim has been asserted against the California Commissioner. There is no genuine issue of material fact as to that claim and he is entitled to the reinsurance proceeds as a matter of law. Therefore, partial summary judgment for the California Commissioner as to the Fourth Claim is appropriate. *See* 6 *Moore's Federal Practice* ¶ 56.17[33], at 56–906 to 07 (2d ed. 1980).[30]

Therefore,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

that American's motion for partial summary judgment as to the Second, Third, Fourth, and Fifth Claims for Relief of the Second Amended Complaint is hereby GRANTED;

that the California Commissioner's motion for partial summary judgment as to the Fourth Claim for Relief of the Second Amended Complaint is hereby GRANTED; and that the California Commissioner's motion for partial summary judgment as to the Second, Third, and Fifth Claims for Relief of the Second Amended Complaint is hereby DENIED.

---

29. Prior to 1979, Cal.Ins.Code § 1033 provided only CIGA with fifth-level priority for claims to reinsurance proceeds. In 1979 § 1033 was amended to provide for fifth-level priority status for all out-of-state insurance guaranty associations. *See* note 22 *supra.* Although it is unclear whether the amendment will be given a retroactive effect, defendants argue that the United States Constitution requires that the amendment apply retroactively.

30. The First Claim for Relief, in which American alleges a right to an offset against any reinsurance proceeds that it may owe pursuant to the subject reinsurance agreements, is also asserted against the California Commissioner. Although, under Fed.R.Civ.P. 56(b), the California Commissioner could properly bring a motion for summary judgment in its favor as to this claim, the motions for summary judgment expressly omit the First Claim for Relief and the issue of an "offset."